## WALTER v. KRESSMAN, ET AL.

### (No. 882; Decided December 10th, 1917; 169 Pac. 3.)

PARTNERSHIP—OWNERSHIP OF PROPERTY—EVIDENCE—STIPULATIONS—
MORTGAGES—AGREEMENT TO GIVE MORTGAGE—CONSIDERATION—DE-
LIVERY— EFFECT OF RECORDING— PAYMENT— PRIORITY— LIEN—PRI-
ORITY OF RECORD—LIS PENDENS—MORTGAGES PENDING SUIT—COM-
MENCEMENT OF LIS PENDENS—SUFFICIENCY OF EVIDENCE—PARTIES
—SUBSTITUTION OF PARTIES.

1. In a suit to foreclose mortgages on the lands of a syndicate
granted by decrees which were based on stipulations pur-
porting to be signed by each member of the syndicate, in
which one of the members of the syndicate denied signing
the stipulations and asserted that he was the sole equitable
owner of the property, evidence held to show the existence
of a partnership between the members of the syndicate, and
that it was the equitable owner.

2. Evidence held to show that stipulations admitting service of
process in suits to enforce agreements to give mortgages,
waiving objections to errors in procedure, admitting the
jurisdiction of the court, and admitting certain facts con-
cerning the agreements to give the mortgages, were signed
by one of the defendants and not forged.

3. A contract signed by W. whereby he undertook to execute a
mortgage in favor of K. "for any amount which will be
paid by him for completion of the purchase price * * * *
up to 850,000 francs, this sum of 850,000 francs being the
maximum of what is due" on the purchase price of certain
land, did not bind K. to advance the entire 850,000 francs to
entitle him to a mortgage, especially where it appeared by
evidence that he was only one of several from whom it was
expected to raise the money.

4. The execution and recording of a mortgage by one who had
promised that it would be executed and recorded consti-
tuted a "delivery," though the mortgage afterwards came
into the possession of the mortgagor's solicitors, who re-
tained it by direction of the mortgagor.

5. Evidence held insufficient to show payment of a mortgage by
the delivery of bonds of a company to which the mortgaged
land was conveyed.

6. In a suit in which the foreclosure of several mortgages was
sought, involving a controversy as to the order of priority,
evidence held sufficient to support a finding that not more
than 5,000 pounds, or $25,000.00, was furnished as the con-

sideration for one of such mortgages purporting to be for $145,000.

7. As between mortgages to two persons advancing portions of the purchase price of land, the mortgage first recorded had priority in the absence of any delivery of the other mortgage prior to the date of its recording, especially where the holder of the mortgage first recorded was promised a first mortgage, and persons representing or assuming to represent the other mortgagee knew of and assented to this arrangement.

8. Under Comp. Stat. 1910, Section 4374, providing that when a summons has been served the action is pending so as to charge third persons with notice of its pendency, and that, while pending, no interest can be acquired by third persons, in the subject-matter as against the plaintiff's title, where, in a suit in which the summons was served prior to the delivery and recording of a mortgage to H. to enforce an agreement to give a mortgage to plaintiff, a decree was rendered requiring the execution of a mortgage to plaintiff as of a date prior to the delivery and recording of H.'s mortgage, and providing that if it was not executed the decree itself should stand as a mortgage, the mortgage in favor of such plaintiff had priority over H.'s mortgage, as a suit for specific performance is within the rule of *lis pendens*.

9. Where the summons in a suit to enforce an agreement to give a mortgage was lost, and there was no showing of the manner in which it was served aside from the original papers and journal entries, but it appeared from a motion to set aside the service and the supporting affidavits that the summons was served on a certain date, though alleged by the motion to have been served improperly, and that the motion was overruled, the statute as to *lis pendens* should be applied as from the date of the service as shown by such motion.

10. In a suit to foreclose various mortgages on the lands of a partnership involving a controversy as to the order of priority, the only evidence that any money was advanced as a consideration for one of such mortgages, purporting to be for $145,000, was the testimony of one of the partners, there being no receipts, vouchers, or memoranda to corroborate his testimony. Though the mortgage was pleaded as a mortgage for $145,000 and had been so described in any assignment of the mortgage without any recital that its actual consideration was less, it was admitted that it

should have been executed for only $100,000, and such partner only claimed that something less than 14,000 pounds was advanced thereon and could only testify as to the amount and dates of payments aggregating 7,200 pounds. The evidence showed that a promise to pay 5,000 pounds was the only consideration for the assignment, and the court found on sufficient evidence that this was all that was advanced on the mortgage. There was also evidence that the mortgagee at one time accepted bonds in payment of the mortgage, released the mortgage, sent a cable to the county clerk that it was released, and that a release executed by one purporting to hold a power of attorney for him was recorded. *Held,* that, in view of these facts tending to throw doubt on the good faith of the mortgage, a decree adjudging that such mortgage and all of the other mortgages were entitled to equal rank awarded the holder of such mortgage all that he was entitled to, if not more.

11. Under Comp. Stat. 1910, Section 4330, providing that upon any transfer of interest the action may be contended in the name of the original party, or the court may allow the person to whom the transfer is made to be substituted for him, where, in a suit to foreclose mortgages, the mortgages were assigned pending the suit and the assignee was made a defendant, but did not file any pleadings, and there was no order of substitution, the action was properly permitted to proceed to judgment in the name of the original parties.

ERROR to District Court, Fremont County; HON. CHARLES E. WINTER, Judge.

Action by Edward Kressman against Joseph H. Lobell, et al., to foreclose a mortgage granted by decree of court. Several other parties intervened, or were brought in as defendants. Charles Walter, as assignee of H. Winfigeld Hillman, brings error to review the judgment.

*E. H. Fourt,*. for plaintiffs in error.

This was not an action to reform an instrument, or which authorized the trial court to reduce the amount of money stated in the mortgage. Madame Bertrand was charged with notice of the Hillman mortgage, and the court could not revive that mortgage to establish her claim; she mistook her remedy, instead of bringing an action

against Walter, et al., which would have been proper, if her claim was valid. The evidence shows that Madame Bertrand agreed to accept a very small percentage of what might be realized, if the property in question were sold for the payment of their several claims, which she would not have done except for doubt as to the validity of her claim. The court erred in treating the several mortgages as mere equities. The Hillman mortgage was executed and recorded prior to the others. The court erred in basing its decision upon the equitable doctrine of priority of equities, since there is no claim that Hillman mortgage is other than a straight legal mortgage for $100,000.00 There is no evidence showing that Hillman authorized Mr. Walter to act and speak for him, authorizing the Hillman mortgage to take second place in case Kressman advanced money to take up the property. The court erred in holding that all of the mortgagees stand in the same attitude. The 25,000 pounds was paid by Hillman prior to the advance of the other mortgage. The Hillman mortgage being duly recorded was notice to and took precedence of subsequent purchasers or incumbrances. (Sec. 3653, Comp. Stat. 1910.) The court was without jurisdiction of defendants, Walter and Hillman, when the judgments for equitable mortgages were rendered, as they had not been served with notice. (Storey C. F. L. 539; Pennoyer v. Neff, 95 U. S. 714, 24 L. Ed. 565.) There were no pleadings by the plaintiff, Kressman, or defendants, d'Hespel and Bertrand. Charles Walter, an assignee of Hillman, and Henry Walter allege that the payments are void, and Hudson Development Company, the real party in interest, does not deny that fact. The suit in equity acts upon the person, and if the allegations and claims of Kressman, d'Hespel and Bertrand were true, the judgment should have been a personal one directing the execution of deeds or mortgages. (Hollander v. Central Metal Co., 109 Fed. 131, 71 At. Rep. 442, 32 L. R. A. P. 72.) An action for specific performance is a proceeding *in personam*. (Dorsey v. Omo, 93 Fed. 74, 48 Atl. 741.) Equitable relief against judgments on the ground of

fraud, accident or mistake is permissible; the statutory
provisions having set aside a judgment are cumulative.
(Edwards v. Cheyenne, 114 Pac. 677; Bank v. Kilpatrick,
et al., 89 Pac. 1035.)   There is no finding of laches on the
part of plaintiffs in error by the trial court, and the judg-
ments were opened and set aside, and the plaintiffs in error
permitted to defend. (Liebhardt v. Lawrence, 120. Pac.
215; In re. Huntington v. Courer, 54 Pac. 208. See also
Stern v. Judson, 127 Pac. 38; Dunlop v. Steere, 28 Pac.
563.) A judgment taken by an unauthorized appearance of
attorney is void.   (Harshey v. Blackmerr, 20 Ia. 161, 89
. Am. Dec. 520; Dubois v. Clarke, 55 Pac. 750.)   A partner
has no power to bind his co-partners by a confession of
judgment against the firm. (Buchanan v. Plow Co., 39
Pac. 899; Hoffman v. Assn., 102 Pac. 1045.)   In Iowa it
is held that such confession is binding upon the partner
confessing. (Scott v. Mudge Co., 13 Ia. 496.)   Some au-
thorities hold that a judgment against one of the parties is
a waiver of demand against the other partners. (81 Am.
Dec. 441; 37 Am. Dec. 469; Gaiennie v. Aikens, 17 La.
42, 36 Am. Dec. 604.)   A delivery cannot be presumed
from the record of an instrument alone.   An unauthorized
appearance by counsel and judgment rendered, while per-
haps a ground for damages against the attorney, is not
binding upon defendants. (Shelton v. Tiffin, et al., 6
Howard 163, 128 L. Ed. 387; Sherrard v. Nerius, et al., 2
Ind. 241, 52 Am. Dec. 509.)   The practice of filing sep-
arate petitions is suggested by our court. (State v. Dis-
trict Court, 39 Pac. 749.   See also 23 Cyc. 369.)   A suit to
quiet title alleging fraud was a direct attack upon the judg-
ment.   (Brown v. Trent, 128 Pac. 895.)   The petitions al-
lege that Lobell was a trustee, and knowing this fact de-
fendants in error should have asserted the powers of the
trustee.   Failure to do so made them guilty of laches, and
the judgment void.   (Freeman on Judgments, Sec. 358.)
Where an agent signed without authority, the contract was
void.   (Anderson v. Rasmussen, 5 Wyo. 44.)   An unau-
thorized confession of judgment by an attorney or agent

is void. (Freeman on Judgments, Sec. 545; Gifford v. Corrigan, 11 N. E. 498.) Delivery of a deed is requisite to a legal execution thereof. Recording is not a delivery. (Chess v. Chess, 21 Am. Dec. 350.) Recording is merely prima facie evidence of delivery. (Gilbert v. N. A. Fire Ins. Co., 23 Wendell 1131, 45 Am. Dec. 543; Bullitt v. Taylor, 69 Am. Dec. 417; 1 Jones on Mortgages, 407.) Where a mortgage was recorded on the 12th of May, 1870, and was held by the mortgagor ready for delivery, when he should obtain a loan and was not delivered until the following month, the latter date was held to be the date of registry, as against one, who had in the meantime acquired a mechanic's lien on the property. (1 Jones on Mortgages, 409, Sec. 541.)

*Fred D. Hammond,* for defendants in error, Kressman and d'Hespel.

The testimony of defendants in error was received below without objection; plaintiffs in error did not reserve exceptions to the proceedings below. Charles Walter reserved an exception to the entry of the final order. The judgment of the court is sustained by the evidence. The action of the trial court in fixing the rank of the mortgages on a parity is sustained by equitable principles in view of the evidence. There is no proof in the record that Hillman's mortgage was ever delivered. It may be assumed for the purpose of the argument that the Desgenetais mortgage was never delivered. In the court below, counsel for plaintiffs in error cited the following authority for the proposition that while the record of an instrument is not a delivery, it is prima facie evidence thereof and presumptive evidence of delivery: 16 Cent. Digest Col. 776; Heil v. Redden, 26 Pac. 2 (Kan.); Bullitt v. Taylor, 69 Am. Dec. 417; Jones on Mortgages, p. 407. Therefore, in the absence of testimony, except the date of record, the date of record is the date when these mortgages become effective between the parties. Service on Lobell on July 20th, 1905, invoked the rule of *lis pendens* as to third persons. Consequently, if

we were to meet counsel on his own ground as to the rank which should be given these mortgages, the Kressman mortgage should be first, the d'Hespel mortgage second, the Desgenetais mortgage third and the Hillman mortgage fourth. Business methods obtaining in France and Eng-- land where all of the business of the borrowing by the Syndicate to complete the Henderson purchase was done should be considered, and the evidence shows various agreements written and verbal as to the intention of the parties, as to the standing of these mortgages. The moneys were not strictly purchase price moneys, but are real in the nature of cash advances. Purchase money is the term used to designate the money stipulated to be paid by the purchaser to the vendor and does not relate as between the borrower and the lender for money borrowed to purchase. (Heuisler v. Nickum, 38 Md. 270, 279; Eyster v. Hathaway, 50 Ill. 521, 525.) The record will show that the perjury was committed by Henry Walter and Charles Walter before the trial court.

*A. C. Campbell* and *Ralph Kimball,* for defendant in error, Madame Bertrand.

The Desgenetais mortgage was supported by valuable consideration. It was given for 26,240 pounds. It will be noticed, however, that the mortgage was given to secure the sum of 30,240 pounds, 4,000 pounds more than was actually advanced, but which represented interest on the loan until May 1st, 1906. Madame Bertrand's petition alleges that the Desgenetais mortgage was delivered to him, which allegation was not specifically denied. The mortgage was placed of record and thereafter became the property of Madame Bertrand. This mortgage has not been paid, notwithstanding a vague attempt to show that it was paid in bonds of the Petroleum Maatschappij Henderson. It was given for money to pay the purchase price of the Henderson lands. There is no evidence that the Hillman mortgage was ever delivered. The evidence is conclusive that there was a delivery of the Desgenetais mortgage. We cannot agree with the decision of the court that all of the mort-

gages were of equal rank. Under the recording statute of Wyoming, Desgenetais was entitled to priority over the Hillman mortgage. (Secs. 3620, 3654, Comp. Stat. 1910.) Most of the assignments of error are mere arguments on immaterial matters which were mentioned or suggested in the evidence. To constitute delivery the grantor must part with the possession of the deed, or the right to retain. (Young v. Guilbeau, et al., 3 Wall. 636, 18 L. Ed. 262.) No particular form or ceremony is necessary to constitute the delivery of a deed, if an intent to deliver is apparent. Delivery for record, if followed by assent, is good delivery. (Lee v. Fletcher, 46 Minn. 49, 12 L. R. A. 171.) Manual delivery of a deed is not an essential requisite to its delivery. (Martin v. Flaharty, 13 Mont. 96, 32 Pac. 287.) One owing money who executes a mortgage and files it for record, intending it to be a valid delivery, and who has paid interest on the mortgage, cannot say that there was not a valid delivery. (Renkin v. Bellmer, 55 Cal. 466.) The execution and recording of a mortgage pursuant to agreement to that effect is a sufficient delivery and acceptance thereof. (Reid v. Abernathy, 77 Ia. 438, 42 N. W. 364; Munro v. Bowles, 54 L. R. A. 865.) There is no error prejudicial to the plaintiffs in error in the record before this court. If error was committed, it was in favor of the plaintiff in error, Charles Walter, and against defendants in error. There is abundant evidence to support the finding of the court that the mortgage held by Madame Bertrand is a valid existing lien and that the trial court would have been fully justified in giving her a mortgage priority over the Hillman mortgage now held by Charles Walter.

POTTER, CHIEF JUSTICE.

This action was brought in the District Court in Fremont County on December 18, 1907, by Edward Kressman to foreclose a mortgage granted by a decree of said court entered on June 22, 1907, covering certain oil lands in said county referred to as the "Henderson Patent," and described as the southwest quarter of section 12, the west half

of section 13, and the north half of the northwest quarter of section 24, in township 32 north, range 99 west of the sixth principal meridian. It was alleged that the owners of said lands were Joseph H. Lobell, Rudi Landauer, Edmund Landauer and Henry Walter, composing a partnership known as the Wyoming Syndicate; that said Lobell held the legal title in trust for said partnership; that by said decree the said Lobell, as the holder of the legal title, was ordered to execute, acknowledge and deliver to the plaintiff a mortgage on said lands for $62,700.00, the amount found due the latter from said parties composing the partnership aforesaid, the same to bear date July 7, 1905, and to be payable on demand with interest at 8 per cent per annum from said date, and that in default of the execution thereof within ten days from the date of the decree, the said judgment and decree should have the effect and operation of such mortgage in law and equity, so as to create a mortgage lien on said lands as of the date aforesaid; that said Lobell having failed to comply with the decree it become operative as such lien as of said date.

The said alleged owners were made defendants in the action, and also the following, alleged to have or claim some interest in or lien upon the premises, viz.: Octave d'Hespel, H. Wingfield Hillman, Louis Joseph Auguste Desgenetais and Countess de Castelbajac. And it was alleged that the claims of said parties, the validity and merit of which were unknown to plaintiff, accrued subsequent to plaintiff's said mortgage lien and were junior and inferior thereto. There was service upon the defendants by publication. Joseph H. Lobell appeared, filing first a plea in abatement, and a petition and bond for the removal of the cause to the United States Circuit Court for the District of Wyoming, whereupon the cause was ordered removed to said court and subsequently was remanded by it to the state court by an order reciting that said United States Court was without jurisdiction. The defendant Lobell then withdrew his plea in abatement and filed a demurrer to the petition which was

overruled, and thereafter an answer denying generally the allegations of the petition.

The defendant, Octave d'Hespel, filed an answer alleging a mortgage in his favor granted by said court as of July 7, 1905, by a decree entered on June 22, 1907, for the sum of $70,206.10, with interest from the decreed date of the mortgage, and that it was a lien upon the premises aforesaid junior and second to the mortgage lien of the plaintiff; and by a supplemental answer said defendant alleged the judicial sale of certain other property under a decree of said court providing for crediting upon his said mortgage the net amount received therefrom, and that there remained due upon said mortgage at the date of said answer, June 19, 1912, the sum of $78,097.89, the total amount of principal, interest and legal costs, less a credit of $30,070.00, the amount for which the other property was sold. And he prayed judgment against the Wyoming Syndicate and the defendants composing that partnership for said amount, and that the mortgaged property be ordered sold to satisfy the same.

The petition alleged that the said Louis Joseph Auguste Desgenetais, a resident and citizen of France, had died subsequent to July 7, 1905, and his daughter, Countess de Castelbajac, her full and correct name being unknown to plaintiff, was his sole heir at law, and by the law of France became seized of all the decedent's estate, real and personal, upon his decease, with full power to administer such estate without appointment as administrator. But, pending the action, E. H. Fourt of Fremont County was by said court appointed as administrator of the estate of said decedent, who, it appears, had died at his home in France in December, 1906. And the action was, on motion of plaintiff, revived as to said decedent in the name of said administrator, and an answer and cross-petition was filed by him; the answer admitting that the defendant, Countess Castelbajac, was the sole and only heir at law of the said decedent, that the plaintiff obtained the judgment alleged in the petition, and that the decedent and his said heir have an interest and

lien upon the premises aforesaid. That interest and lien
was alleged in the cross-petition to consist of a mortgage
covering the premises executed by Joseph H. Lobell to said
Desgenetais July 19, 1905, and recorded on July 27, 1905,
to secure the payment of the sum of 30,240 pounds sterling,
and that mortgage was alleged to be a first and prior lien
upon the premises. It prayed for judgment against Lobell
for the said amount with interest, that the mortgages of
Kressman, d'Hespel and others be held subject to the lien
of the Desgenetais mortgage, and that the premises be sold
as on execution to satisfy said mortgage indebtedness.

In the meantime an order had been entered in the cause
on plaintiff's application making the Petroleum Maatschap-
pij Henderson, a foreign corporation organized under the
laws of Holland, Edward H. Power and the Wyopo Com-
pany, a corporation organized under the laws of the State
of Maine, additional parties defendant, by reason of an al-
leged interest in the mortgaged premises acquired by those
parties respectively, and the plaintiff was permitted to file
a supplemental petition as against them. It is unnecessary to
refer to that petition further than to say that it alleged that
in June, 1909, the said Joseph H. Lobell had, by quit claim
deed, conveyed to the Petroleum Maatschappij Henderson
all the interest in said premises of said Lobell, Rudi and
Edmund Landauer, Henry Walter and the Wyoming Syn-
dicate, and that said deed was duly recorded on November
6, 1909; and that said Henderson Company, with the con-
sent of the Wyoming Syndicate and the said members there-
of, had entered into a contract of lease with the defendant
Power for exploiting the said lands for mineral purposes
and producing and marketing the oils thereon, and that
said lease had been transferred by Power to the said Wyopo
Company. We do not understand that leasehold interest
to be material upon the points involved in the controversy
now before this court, nor the other matters not here re-
ferred to mentioned in said supplemental petition.

Thereafter, by consent of the court, an intervening peti-
tion was filed by one Madame Bertrand, widow of Ernest

Bertrand, of Paris, France, whose full name appears to be Martha Marie Alice Bertrand. It was alleged in that petition, in substance, referring only to the matters now material, the following: That the administrator of the Desgenetais estate was without authority in said matter, for the reason that the said Desgenetais, at the time of his death and for many years prior thereto, was a citizen and resident of the Republic of France, and domiciled therein, never resided in the State of Wyoming or in the United States, and that he died in France, having in his physical possession therein the mortgage sought to be foreclosed by the administrator's cross-petition, and that he had no property in this state; and that the said administrator's appointment was without the jurisdiction of the District Court in Fremont County. It further alleged the law of France vesting all the estate of a decedent at once upon his death in his heirs at law. That the only heir of said decedent was Marguerite Desgenetais, Countess Castelbajac, who became, upon the death of the decedent, the owner of the mortgage set up in the administrator's cross-petition; and that after the death of said Desgenetais, and on October 21, 1910, she sold, transferred and assigned to said intervenor all her right, title and interest in said mortgage. The execution and recording of the mortgage is then alleged, and the indebtedness to secure which it was given, and, further, that the whole of the consideration of the mortgage was paid and advanced by the intervenor and one Fernand de Parseval, to whom the mortgage debt was actually owing, and that the said decedent, Desgenetais, held the mortgage in trust for their use and benefit; that after his death his daughter, as his sole heir at law and holder of the legal title in the mortgage, in execution of said trust made the assignment of the mortgage to the intervenor, who thereupon became the holder as well as the owner of the mortgage and entitled to collect and enforce the same. The mortgage was alleged to be a first and prior lien upon the property, and judgment for the amount and for a sale of

the property under decree as upon execution for the payment of said indebtedness was prayed.

The cause was tried and judgment rendered on June 19, 1912, orders having been entered declaring the default of the defendants who had failed to answer or otherwise plead to the petition, and as to the intervening petition the default of the parties failing to plead thereto, and issues having been joined upon the intervening and cross-petitions by the plaintiff and other parties appearing in the cause.

The judgment recited the entering of said defaults, and, specifically, that due and regular service by publication was made on the defendants Lobell, Rudi and Edmund Landauer, Walter, d'Hespel, Hillman, Countess Castelbajac, and the Wyoming Syndicate, and that due and regular service of summons, with a copy of the petition and supplemental petition, was made upon the Petroleum Maatschappij Henderson, the Wyopo Company and Edward H. Power, and that all of said defendants were in default, except Joseph H. Lobell and Octave d'Hespel; that the defendant Fourt, administrator of the Desgenetais estate, had appeared by answer and cross-petition, the defendant Bertrand by her intervening petition, and the defendant Lobell by filing a general denial; that the cause being ready for trial, the plaintiff, defendants Lobell, d'Hespel and Bertrand appeared by counsel and the defendant Fourt, in person; and that, on behalf of the plaintiff, and the defendants d'Hespel and Bertrand, witnesses were examined, and depositions, documentary and other proof introduced, including a stipulation of the defendant Bertrand as to the rank of the several mortgages in question, and that no testimony was produced on behalf of any of the other defendants, the defendant Lobell merely objecting to certain proofs, which objections were overruled, said Lobell excepting thereto. It stated the findings substantially as follows:

That there was due the plaintiff from the defendants Lobell, Rudi Landauer, Edmund Landauer and Henry Walter, and the Wyoming Syndicate, a partnership composed of said parties, on the mortgage described in the peti-

tion the sum of $62,700.00 with interest thereon at eight per cent per annum from July 7, 1905, amounting in the aggregate at the date of the judgment to $97,566.70; and that said mortgage was a first and prior lien upon the premises. That there was due the defendant Octave d'Hespel from the same parties on the mortgage described in his original and supplemental answer the sum of $78,097.89 principal, interest and costs, less all proper credits, said mortgage to rank as a second mortgage lien on said premises. That there was due from the same parties to the defendant Bertrand, as the owner in law and equity of the mortgage described in her intervening petition, executed by said Lobell to Louis Joseph Auguste Desgenetais, the sum of $147,-420.00, with interest thereon at eight per cent per annum from July 19, 1905, amounting in the aggregate to $229,-004.00; said mortgage to rank as a third mortgage lien upon the premises. That the Petroleum Maatschappij Henderson, on June 15, 1909, became the holder and owner of the legal title to the lands in question through a valid deed executed and delivered on that date by said Lobell, and recorded on November 6, 1909. And it was ordered and adjudged that the rights and mortgage liens of said parties were as so found, and that they respectively have and recover the said respective amounts from the defendants named in the findings as the debtors, with costs; that unless the same be paid within five days an order shall issue for the sale of the mortgaged premises, and the same sold as upon execution, as one tract; and that after said sale all of the said debtors and other defendants (naming all except the defendants d'Hespel and Bertrand) be barred and foreclosed of and from all lien upon, right, title, interest, estate or equity of redemption in the said lands, excepting the right of redemption provided by law.

On August 20, 1912, Henry Walter and the Petroleum Mattschappij Henderson filed a joint motion to vacate and open said judgment and permit them to make their defense therein, and on the same day H. Wingfield Hillman filed a similar motion. By an order entered on November 30, 1912,

said motions were granted as to Walter and Hillman, but denied as to the other defendant. Thereupon the defendants Walter and Hillman filed separate answers, the said Walter denying generally the plaintiff's petitions, except that certain averments of his supplemental petition, not here material, were admitted, denying that there was any consideration for the Desgenetais mortgage or the assignment thereof to Madame Bertrand, or that the mortgage was executed by Lobell, and alleging that it was fully paid to Desgenetais in his lifetime; and denying generally the averments of d'Hespel as to his mortgage, except that the statements in his supplemental answer respecting the judicial sale of certain other property under his mortgage were admitted, and alleging an assignment of the mortgage prior to the filing of said supplemental answer. The several answers of the defendant Hillman made similar denials and averments, and alleged a first mortgage upon the premises executed and delivered to him by Joseph H. Lobell on July 8, 1905, for the sum of $145,000.00, and recorded on October 6, 1905; and that there was due thereon the said sum with interest from its date at 6 per cent per annum. There were replies to this answer denying the validity and priority of lien of said mortgage, and alleging that it had been paid, and cancelled and discharged by a release duly recorded. Walter also filed amended and supplemental answers alleging that the judgments granting respectively the Kressman and d'Hespel mortgages were rendered without jurisdiction over the person of said defendant. On the application of one Charles Walter, as assignee of the Hillman mortgage, he was substituted for said Hillman as a defendant and thereupon he adopted as his own the answers filed by Hillman, alleging only in addition thereto the assignment of the latter's mortgage to him.

The cause came on again for trial in August, 1914, upon the issues between the plaintiff, defendants d'Hespel and Bertrand and the defendants Henry and Charles Walter. This resulted in a modification of the original judgment in certain particulars. It was found and adjudged that Henry

Walter was bound by and subject to the original judgment. That the plaintiff Kressman and the defendants d'Hespel and Madame Bertand have valid and subsisting mortgage liens for the respective amounts with interest, as found and adjudged in their favor by the original decree. That Charles Walter, as assignee of the Hillman mortgage, has a valid and subsisting mortgage lien for the sum of $25,000, with interest from July 8, 1905, at 8 per cent per annum. That all the moneys owing upon said mortgages were obtained by the defendants Lobell, the Wyoming Syndicate, and the members of that partnership, for and were used in the purchase of the lands in question, and that the said mortgages are of equal rank. And it was ordered that said mortgagees, respectively, have and recover the sum due and owing to them, reciting the respective amounts due at the date of the original judgment from the defendants, Lobell, Rudi and Edmund Landauer, Henry Walter, and the Wyoming Syndicate, a partnership composed of said last named defendants; that in all other respects the original judgment be confirmed and approved; that a certain sale of the lands under said judgment be vacated and a resale be had as in that judgment provided and as modified.

Henry Walter and Charles Walter are here complaining on error of the judgment last rendered. The only parties appearing in opposition to the petition in error are Kressman, the plaintiff, d'Hespel, one of the defendants, and Madame Bertrand, the intervening defendant. They each excepted to the judgment, and state in their respective briefs that they were dissatisfied with that part of the judgment allowing a lien in favor of the Hillman mortgage and declaring the several mortgages to be of equal rank, and held the opinion that the court erred in those respects, but had concluded to accept the conclusion of the trial court to save further litigation and therefore urge an affirmance of the judgment on the ground that there is no error prejudicial to the plaintiffs in error.

A large amount of evidence was introduced on the trial, consisting mostly of depositions taken in England and

France, with numerous exhibits of letters, telegrams, contracts, stipulations, corporate proceedings, checks or drafts, receipts and other papers, covering the correspondence and transactions of the several parties and others more or less relevant to the matters in controversy through a period of several years, and including the recorded mortgages and the court records establishing the Kressman and d'Hespel mortgages, making a volume of evidence so large that our reference to it must be confined to stating the more important facts necessary to explain the points involved.

In April, 1903, Henry Walter, of London, England, entered into a written contract with one John McClelland Henderson for the purchase of the lands in question, and on July 7, 1905, payment of the purchase price having been completed, Henderson by said Walter's direction conveyed the lands to Joseph Henry Lobell. Although not so appearing on the face of the deed, the evidence shows, and it is conceded, that Lobell took and held the title as trustee. One of the questions in the case was whether he was trustee for Henry Walter as the sole bneficial and equitable owner, or for him and the other parties composing the partnership known as the Wyoming Syndicate. The court found that he held the title in trust for said partnership, and that is supported by abundant evidence. The members of the partnership appear originally to have been Henry Walter and Rudi Landauer, the arrangement between them being a verbal one, but Lobell, at first their agent and manager of their Wyoming interests, became associated with them prior to the time when the various sums of money represented by the mortgages in question were borrowed, and assisted in procuring some of the money. A written agreement was entered into between said three parties in September, 1905, stating their respective interests, and that all former agreements or undertakings between them were thereby revoked. They became known and were commonly referred to as the Wyoming Syndicate. It seems that Edmund Landauer, prior to the completion of the purchase, and while at least some of the borrowed money was being obtained, had some

kind of an interest, but what it was is not definitely shown. He appears to have taken some part in raising money for the Syndicate, and signed some stipulations which will be referred to naming him as a member thereof. But what his interest was, or whether he was actually a member of the partnership, is not material, for whatever his interest he is bound by the proceedings in this case and in the actions brought by Kressman and d'Hespel to establish their respective mortgages.

At the direction or request of Henry Walter, the said Lobell, acting through Fred J. Lobell as his attorney in fact, executed at Chicago, Illinois, a mortgage covering said lands to H. Wingfield Hillman of London, England. The mortgage was dated July 8, 1905, and appears to have been acknowledged on that date, and it was recorded in the proper office in Fremont County on October 6, 1905. It states the sum of $145,000.00 as the amount of the debt secured payable five years from the date of the mortgage. But Mr. Henry Walter testified, and the party claiming under the mortgage concedes, that the amount for which it was directed to be executed was $100,000.00, and that the sum of $45,000.00 was added without authority.

Another mortgage dated July 19, 1905, and appearing on its face to have been executed and acknowledged on that date at Chicago, Illinois, was executed by Joseph H. Lobell, acting by his attorney in fact, Fred J. Lobell, to Louis Joseph Auguste Desgenetais of Bolbec, France, to secure the payment of the sum of 30,240 pounds sterling, on the first day of May, 1906. That mortgage was recorded in the proper office in Fremont County on July 27, 1905. The actual amount advanced as the consideration for that mortgage was 26,240 pounds, and it was advanced by Madame Bertrand and one Fernand de Parseval, for whom she acted, to be loaned through Desgenetais to Henry Walter and the others composing the said Wyoming Syndicate to complete the payment of the purchase price of the lands in question, for which it had been agreed that Desgenetais was to be secured by a mortgage on the lands. The difference be-

tween the amount advanced and the sum stated in the mort-
gage seems to have been included either as a bonus or as
interest. The court, however, in sustaining the mortgage
allowed merely as principal the amount actually advanced.
After the death of Desgenetais his said daughter, the sole
heir at law, assigned the mortgage to Madame Bertrand,
the equitable owner thereof.

On January 14, 1905, the plaintiff Kressman and the
defendant d'Hespel each brought an action in said District
Court, naming as defendants the said Joseph H. Lobell, Rudi
Landauer and Henry Walter, a co-partnership doing busi-
ness as the Wyoming Syndicate, to establish a mortgage upon
the lands under an alleged agreement therefor upon a loan
of money to be used in paying the purchase price for said
lands. And a final decree to that effect was entered in each
case on June 22, 1907. The decree in Kressman's favor re-
quired said Lobell, the holder of the legal title, to execute,
acknowledge and deliver to Kressman a good and sufficient
mortgage covering the lands in question as of April 7, 1905,
for the sum of $62,700.00, the same to draw interest at 8
per cent per annum from said mortgage date, and that the
mortgage be recorded as of said date; and the decree de-
clared that if the mortgage was not executed and recorded
within ten days the decree should have the effect and op-
eration in law and equity of such mortgage so as to impose
a mortgage lien upon the lands in favor of Kressman as of
said date. The decree in the d'Hespel case was similar, re-
quiring and declaring the mortgage in his favor for the
sum of $70,206.10, as of July 7, 1905, and to bear interest
from that date at 8 per cent per annum, subject to the
mortgage of Kressman. Prior to the decrees Edmund
Landauer was added as a party defendant, a stipulation
having been signed by him for his appearance in each action.

There was an appearance in each of the said last men-
tioned actions by an attorney assuming to represent the
defendants, who subsequently withdrew his appearance,
and, thereafter, the defendants having been adjudged in de-
fault, a motion was filed by two other attorneys who signed

as attorneys for the defendants, to set aside the default and permit the filing of an answer, which motion was over-ruled, but an order was entered permitting said attorneys to appear at the trial and cross-examine witnesses.    However, prior to the said respective decrees, a written stipulation in each case dated May 25, 1906, and purporting to be signed by each of the defendants and Edmund Landauer, as mem-bers of the Wyoming Syndicate, was, as we understand, at-tached to or returned with certain depositions taken in France.    At least such stipulation was before the court in each of said cases.    It admitted the service of process, the amended petition and other papers in the case upon each of the parties to the stipulation, waived all objections to errors or faults in the procedure theretofore taken in the action, and admitted that the defendants and Edmund Landauer were duly, legally and properly before the court and subject to its jurisdiction in the particular case; and it recited that it was made pursuant to an agreement of the same date be-tween the said parties and the plaintiff.    The stipulation in the Kressman case further recited that the defendants, Henry Walter, Rudi Landauer, and Edmund Landauer, then co-partners doing business as the Wyoming Syndicate, did, prior to November 3, 1904, contract and agree through said Henry Walter for the purchase from John M. Hender-son and his wife of certain lands in Fremont County, Wyo-ming; that said Walter, on November 3, 1904, acting for himself, Rudi and Edmund Landauer, and in the presence and with the knowledge and consent of Joseph H. Lobell, did execute and deliver to said Kressman the instrument thereto annexed (the mortgage agreement relied on and al-leged by Kressman) ; that on November 3 and 5, 1904, the said Kressman paid to said Walter for him and the other said parties and with the knowledge and consent of said Lobell the equivalent in English pounds of 250,000 francs in French currency; and thereafter, on June 22, 1905, the sum of 50,000 francs to Rudi Landauer for the said par-ties; that the said sum of 300,000 francs was then due and owing by said parties to the said Kressman, with interest

from the date of the payments. There are other recitals in the stipulation not now necessary to state, except it recited a claim of the defendants that the payment of June 22, 1905, was independent of the agreement of November 3, 1904, that Kressman was not entitled to a first mortgage, but was entitled to a mortgage to rank after the mortgages of Henry W. Hillman and Louis Desgenetais for the sums of $145,000.00 and 30,200 pounds sterling, respectively.

The stipulation in the d'Hespel case also contains recitals similar to the Kressman stipulation respecting the relationship of the parties, and admitting that said d'Hespel had advanced to the Wyoming Syndicate $67,500, the amount of advances here claimed by him, and admitting that he was entitled to a mortgage for the amount conceded to have been advanced to rank immediately after the mortgages of Hillman and Desgenetais. Each stipulation stated that it might be produced in the trial of the suit and that the plaintiff should be entitled to testify and produce other witnesses or proof or by deposition.

As above stated, these respective stipulations, together with other evidence produced were before the court in said actions, and upon the whole of the evidence the respective decrees were entered requiring the execution of and establishing the Kressman and d'Hespel mortgages.

It was contended on the trial and is here contended by the plaintiffs in error that Henry Walter did not sign the stipulations aforesaid in the former Kressman and d'Hespel cases, but that his signature to each stipulation and the agreements of the same date was forged. And, further, as above stated, that he was the sole equitable owner of the property, and remained such owner even after the conveyance to the Petroleum Maatschappij Henderson. And, therefore, it is here contended, as in the trial court, that he was not bound by the judgment establishing the Kressman and d'Hespel mortgages. And it is argued that there was no Wyoming Syndicate and no partnership between any of the parties until the written agreement between Lobell, Rudi Landauer and Henry Walter on September 5, 1905. But we

think the evidence clearly sustains the finding of the trial court against the plaintiffs in error upon these questions. The evidence as to the genuineness of Henry Walter's signature to the stipulations is conflicting, but clearly sufficient, in our opinion, to sustain the conclusion of the trial court upon that matter.

There was little, if any, conflict as to the fact of the existence of the so-called Wyoming Syndicate from soon after, if not before, the contract between Walter and Henderson for the purchase of these lands; the question as to such partnership being more one of law than of fact. The stipulations aforesaid refer to the parties as constituting the Wyoming Syndicate, and, if signed by Walter as found by the court, they were binding upon him as against Kressman and d'Hespel. He admitted in his testimony that Rudi Landauer was interested with him in the profits, while seeming to deny that he was a partner. And he signed a paper dated March 20, 1908, addressed: "To all whom it does or may concern," which was recorded in the office of the Register of Deeds of Fremont County on April 2, 1908, stating that he revoked any authority given by him to Joseph H. Lobell, or Fred J. Lobell, or their firm of Lobell & Lobell to act for him in any business transactions, and particularly in relation to oil, mineral or other properties in Wyoming, and: "That all such oil, mineral or other properties whatsoever, now registered in the name or names of Joseph H. Lobell, or Fred J. Lobell, or of their firm of Lobell & Lobell, or some one or both of them, or their nominee or nominees, are so registered and held for and on behalf of me and other third parties the true owners jointly with the said Joseph H. Lobell, and that the said Joseph H. Lobell, and Fred J. Lobell, or some or one of them or their nominee or nominees, are only trustees for such true owners of all the aforesaid oil, mineral and other properties whatsoever." To further show the evidence on the subject we cannot do better than to quote from the written opinion of Judge Winter, who presided at the trial, stating and explaining the court's findings upon the questions raised upon

the evidence. Upon this question the learned judge said in part:

"There are various affidavits and sworn statements, declarations in printed documents and sworn statements, declarations in solemn instruments which, if they do not amount to an estoppel in law with reference to the plaintiffs in this case, and against the defendant Walter, they at least constitute a heavy preponderance of the evidence against his claim. It shows conclusively Mr. Walter actively engaged in the affairs of the Petroleum Maatschappij Henderson, and it was at his direction and request that Lobell as trustee for the Wyoming Syndicate made the transfer of the 560 acres involved herein. Mr. Walter was and is a director in that concern. Mr. Walter accepted, retained and sold for his own use bonds of said company, and his claim of sole, original ownership in himself in the face of these facts is absolutely inconsistent and impossible. * * * * Among many other items of proof of the existence of a partnership from an early date is the following quoted from a letter written by Mr. Walter, March 18, 1908, addressed to the County Clerks of the State of Wyoming: '* * * * I beg to inform you that by a partnership agreement dated 5th September, 1905 (following on from the business arrangements of myself resulting in a partnership between myself and Mr. Rudi Landauer in 1902) * * * *' On May 5, 1905, Rudi Landauer writes d'Hespel: 'The undertakings which I take toward you are taken by me in the name of the Wyoming Syndicate of which Mr. Lobell forms part.' Thus a partnership existed which included Lobell prior to the agreement of partnership in writing September 5, 1905. Lobell's activities with Walter and Landauer run back several years prior to that and evidently under a verbal partnership arrangement. To the question: 'Speaking of the 560 acres; they had been transferred to the company and previous to this they had been held by Lobell as Trustee for the partnership, the Wyoming Syndicate?' Walter answered: 'If you like to put it that way, yes.' While the partnership was not reduced to writing until Septembr 5th, 1905, there is

evidence running all through the case that a verbal partner-
ship existed probably as early as 1902 with reference to the
Wyoming lands, and in the judgment of the court, beyond
question, at the time of the giving of the mortgages. It was
reduced to writing in 1905 to define their interests and rights
one with the other. But they, meaning Walter, Landauer
and Lobell, and later, E. Landauer and Oppenheim, in a
small interest, had engaged in concerted partnership acts
long prior to that date. In answer to a final, direct question
after several pages of testimony on the subject, Mr. Walter
admitted, upon cross-examination by Mr. Robinson, that it
was 'true in substance that Lobell held the property' up to
1908, or the date of the stipulations in 1906 for the Syndi-
cate. * * * * The finding of the court upon this con-
tention of Mr. Walter is that it is not established by the evi-
dence, and that Lobell held the title as trustee for the Wyo-
ming Syndicate, at the time of the matters here involved;
that the Wyoming Syndicate transferred title by its Trustee,
Lobell, with the knowledge and consent of the members of
the Syndicate, and each and all were paid a valuable consid-
eration therefor in bonds of the company (to which transfer
was made) the Petroleum Maatschappij Henderson, Mr.
Walter selling some of his bonds, and that the actual title,
both legal and equitable, is in the Petroleum Maatschappij
Henderson."

The learned trial judge did not attempt to state every item
of evidence showing the existence of the partnership and its
position as equitable owner of the property prior to its con-
veyance by Lobell to the company aforesaid. To do so here
is unnecessary. We are satisfied that no other conclusion
is reasonably possible, and we adopt what was said, as above
quoted, as a sufficient concluding statement of our reasons
for holding the evidence sufficient to sustain the trial court's
conclusion as to the title and equitable ownership of the
property.

The conflict in the evidence as to the signing of the stipu-
lations aforesaid is not the result of contradictory statements
of witnesses testifying directly, from asserted or assumed

personal knowledge, as to the existence or truth of the fact
in dispute. Although Henry Walter testified that he did not
sign the stipulations or either of the other agreements of the
same date, no one has testified to having seen him sign, nor
does it appear that any one could so testify who could be
produced as a witness when such testimony denying the sig-
natures was given or at any time thereafter; that testimony
having been given at the taking of the depositions of sundry
witnesses, including said Walter, in London, England, which
was commenced on November 19, 1913, and concluded on
or about January 5, 1914, and most of the evidence on this
question appearing in those depositions. His name, however,
appears to have been signed to each of said stipulations and
agreements in the presence of a subscribing witness, one
Arthur Morris, a commissioner of oaths, who attested the
signature by writing opposite the name and the signature of
Joseph H. Lobell: "Signed by the said Joseph H. Lobell
and Henry Walter in the presence of Arthur Morris," add-
ing underneath his name his official title of commissioner to
administer oaths of the Supreme Court of Judicature in
England. But he was not living when the evidence afore-
said was taken, having died in 1909. His signature as such
subscribing witness was, however, identified by his son, who
testified that he was acquainted with it and had frequently
seen him write, and he produced for comparison two paid
checks signed by his father, one of which he saw him sign,
and they were put in evidence without objection. He fur-
ther testified that his father was a commissioner for oaths in
1906, the year in which the papers aforesaid were dated and
purport to have been executed. The signature was also
declared to be genuine by expert opinion testimony upon
comparison with the signatures to the checks, and there is
nothing in the evidence impeaching its authenticity.

The other evidence tending to show the genuineness of
the disputed signatures consists of the following: The tes-
timony of a handwriting expert of the highest standing and
reputation in England as such expert, as shown by the evi-
dence, stating most positively his opinion, upon comparing

the disputed signatures with admitted signatures of Henry Walter to letters which had been introduced in evidence as otherwise relevant upon the issues in the cause, that all the signatures—those admitted to be genuine and the others denied—were written by the same person. The opinion testimony of another witness who was acquainted with Henry Walter's handwriting and had seen him write that the disputed signatures were his. Certain facts tending to support the genuineness of the signatures; and the signatures aforesaid and several others in the evidence admitted to be genuine which were compared with the disputed signatures by the court.

It was shown that the handwriting expert, Mr. Gurrin, had made a special study of handwriting for twelve years, that he was constantly called upon to testify in the courts as an expert on the subject, had been engaged in hundreds of cases, and was constantly being consulted by the leading solicitors in the British Isles, the principal banks, the police authorities, the Director of Public Prosecutions, and accepted as a qualified expert in disputed handwriting in all the courts. And it appears that prior to testifying he had examined the disputed signatures and the others shown to him admitted to be genuine. Explaining the reasons for his conclusion that the disputed signatures were genuine, he stated in detail the characteristic features of the signatures admitted to be genuine and that all such features appeared in those disputed, with slight variations in the four that were disputed as in the others. And the latter fact, he stated, strongly indicated that they were genuine. Without taking the time or space to quote or refer to the particular features of the signature thus explained by the witness, it may be said that he described those denied as perfectly clean, straightforward signatures, without any trace of hesitation, and appearing to have been written in a perfectly natural manner. He also testified that he could not conceive of anybody writing the signature "Henry Walter" with the same freedom which appears in the disputed signatures other than the person who wrote the admitted signatures.

Mr. Walter having testified that his former private secretary, a Mr. Lobban, who had died after 1906 and before said evidence was taken, was able to and frequently did sign his name and reproduce his signature to letters and unimportant papers by his request or consent, and suggested the theory that the said Lobban may have signed his name to the papers in question, without authority, and having also identified as in Lobban's handwriting some names written in the call book kept in his office to record the names of callers and the time of their calling there, Mr. Gurrin was asked whether, in his opinion, the person who wrote the names aforesaid in the call book could as easily imitate Mr. Walter's signature as one writing a free hand, and he answered: "I must emphasize again that I cannot conceive the signatures being imitated at all, but in addition I must say that it would be much more difficult for one writing this style of hand to imitate it than for a person who wrote a very free hand." He also identified, as in his opinion authentic the initials "Hy W." appearing at several places on the margin of the disputed papers, opposite changes or interlineations therein, Mr. Walter having denied that they were written by him.

The stipulations and agreements aforesaid are each dated May 25, 1906, and they were signed on that day at Paris, France, by Rudi and Edmund Landauer. Lobell appears, as aforesaid, to have signed in the presence of a subscribing witness in London. But there are two of his signatures to each paper, the first, as stated underneath the name, as attorney for defendants, meaning the defendants in the Kressman and d'Hespel cases in which the stipulations were respectively filed, and it may be that he signed in that capacity at Paris and that his personal signature was the one attested by the subscribing witness. It was understood that the papers should be taken at once by Mr. Lobell to London to be signed by Mr. Walter, and a space appears to have been left for his signature between Lobell's personal signature and that of Edmund Landauer, for that is the order in which the names appear. And it is shown by the following evi-

dence that Mr. Lobell was in London on May 25th, 26th and 28th. The call book kept in Mr. Walter's office showed that Lobell called there on May 25th at one o'clock, again on the next day, the 26th, which was Saturday, at 12 o'clock, and also on the following Monday, the 28th, at 11 o'clock, and that on this day he called to see and did see Henry Walter. It is also shown by the call book that a Mr. Morris called on the 26th at 12:20 o'clock, that entry appearing immediately under the entry of Lobell's call at 12 o'clock. This evidence was brought out on cross-examination of Henry Walter, and upon his being asked to produce his call book. We understand the evidence also to show that Mr. Lobell returned to Paris on the evening of Monday, the 28th, or the next day, and that the papers were there at that time, if they had not been returned from London by mail before then.

As against the possible inference from the call book entries aforesaid as to the signing of the papers on the 26th of May when Lobell and Morris called at his office, there is the testimony of Henry Walter that he was not in his office on either the 25th or 26th of May, and the corroborating testimony of two other witnesses, one of them having been employed as a nurse at the place where he claimed to have been all of the 25th and until taking the train for London on the morning of the 26th, which brought him to the station in London, about twenty minutes' ride from his office, a little before 12 o'clock, and the other a lady employed as an assistant in his office at that time and lived at his house. The latter testified that she met Mr. Walter on the 26th at the station, and left him there about twenty minutes or half an hour after he had arrived, and that she then returned to the office, remaining in her room above it until about 5 o'clock, and that Mr. Walter was not in his office that afternoon. It will serve no useful purpose to recite the further particulars of that testimony, or Mr. Walter's explanation of his movements on the afternoon of the 26th, except that he testified that he did not meet either Lobell or Morris at

any time that day and did not recall having ever met Mr. Morris.

The trial court, referring to the testimony of Mr. Walter's former office assistant, said concerning it that it was impossible to read her evidence, which was given at the trial, without being convinced that she had testified, not from a distinct personal recollection of the events of that day, but from the habits and customs of the office and of Mr. Walter with respect to absenting himself from the office on Saturday afternoon; that her direct answers to the effect that neither Mr. Walter nor anyone was at the office that afternoon were supplemented by stating some habit or custom of herself, Mr. Walter, or the other office employees. And the court concluded that, notwithstanding said corroborating testimony, it was possible for Mr. Walter to have been at the office and sign the papers there while Lobell and Morris were present, or, that he might have signed it elsewhere in London on that day, or on the 28th, unless the latter date should be excluded because of a letter in evidence written by Mr. Lobell to Rudi Landauer on the 26th stating that final agreement duly signed was enclosed, which may or may not have been the stipulation or agreement in question. That letter with others written by Lobell on May 25th and 26th of said year appears to have been written in Mr. Walter's office, for it was shown by copy found in Mr. Walter's letter copy book kept in his office. And it seems to us that the final agreement referred to was probably the one in question, since it calls attention to the fact that the writer had made a few alterations in the agreement. One of said other letters was also to Rudi Landauer dated the 25th and stated: "Arrived here all safe; am taking care of business on this side. Have another appointment for tomorrow morning, which will see the matter through."

Except the recital in each stipulation that the several members of the Wyoming Syndicate, naming them, had entered into a contract for the purchase of the lands in controversy through Henry Walter as one of their number, the stipulations and agreements contain substantially no re-

cital of facts against his interest which have not been directly or inferentially admitted by him by letter or otherwise; and the trial court called attention to that situation, evidently as tending to show that the papers might well have been signed by him. And it appears that they were entered into to protect his interest as well as that of the other parties, for the agreements respectively recite that the party of the first part (Edward Kressman in the one agreement and Octave d'Hespel in the other) had instituted proceedings in Wyoming and in Belgium for the sums claimed to be due them from the parties of the second part (Lobell, Rudi and Edmund Landauer and Henry Walter) and for a mortgage, and that said parties of the second part had asked for a stay of proceedings in Wyoming until October 15, 1906, and the discontinuance of the proceedings in Belgium; and that was provided for upon certain stated conditions. Mr. Walter's letters which were used for comparison by the expert witness aforesaid in testifying as to the authenticity of the disputed signatures, written in 1908 and 1909, disclose that he knew of the mortgage decrees of June, 1907, and the subsequent foreclosure proceedings, and was arranging to pay the amounts respectively due on the several mortgages without denying his obligation under said decrees or that they were binding upon him.

The fact has been referred to that the evidence contains many of Walter's admitted signatures, not only his name in full, but also his initials, "Hy W.," as written by him; and it appears that the trial court compared the several signatures and initials admitted to be genuine with those disputed. We find in the written opinion of the court aforesaid this reference thereto:

"It must be conceded, that the signature of Henry Walter and his initials on the margins of the stipulations, to the ordinary eye, compared with the admitted signatures appear to be genuine. It is a very unusual signature, and every characteristic in the minutest detail is reproduced."

And at another place in the opinion the court referred to "the apparent genuineness of his signatures." The initials

aforesaid appear on the disputed documents in each instance immediately under or following the initials "J. H. L.," evidently written by Mr. Lobell. And as found on these papers, they furnish additional circumstantial proof of the genuineness of the disputed signatures. It is difficult to conceive that one forging the signatures would add to the possibility of detection by also writing the initials in several places on the papers, especially where the authority of the changes are verified by the initials of another party to the instrument. Although both Henry and Charles Walter testified that Mr. Lobban could and occasionally did imitate Henry's signature and sign the same by request or consent to unimportant letters or papers, no specimen of the signature as signed or written by him was produced in evidence.

The trial court concluded upon all the evidence that the disputed signatures were genuine and that Mr. Walter was bound thereby and subject to the judicial proceedings based thereon. The original letters and papers containing the admitted as well as the disputed signatures are in the record here, and justify us in saying that the learned trial court did not overstate the fact of the apparent genuineness of the signatures here disputed. In view of all the evidence covering the question, we are satisfied that it is sufficient to sustain the court's conclusion as to the genuineness of the signatures, especially in connection with the declared effect upon the mind of that court upon comparing them with the signatures admitted to be genuine. ·

· It having been found upon evidence which we hold sufficient that Henry Walter is bound by the decrees establishing the Kressman and d'Hespel mortgages a further consideration of those mortgages is necessary only with respect to their right to equal rank with the Hillman mortgage, as security for the respective amounts, allowed by the court, a right denied by Charles Walter, the assignee of the last named mortgage, and one of the plaintiffs in error. While the defendants in error represented here do not agree that anything should have been allowed upon the Hillman mortgage, or that it is entitled to equal rank with their

mortgages, they are not here complaining of the findings
or judgment in those respects. The trial court concluded
its consideration of the evidence relating to the amounts
due respectively upon the mortgages of the defendants in
error by saying:

"On the whole matter of the Kressman, d'Hespel and
Desgenetais mortgages, Henry Walter helped to solicit them
or had knowledge of the solicitation of them by members
of the Wyoming Syndicate, promised both Kressman and
Desgenetais first mortgages—and tried to get them all to
accept bonds in payment, and recognized all three mort-
gages in letters and documents and promised payment of
them, tried to raise money to buy the Kressman mortgage,
and tried to raise money to settle and promised to settle the
Desgenetais mortgage, and recognized them all in numer-
ous ways."

And the evidence fully sustains the trial court in those
statements. It is contended that by the terms of the con-
tract for the Kressman mortgage the latter was to furnish
the entire amount of the balance then due upon the pur-
chase price of the lands to entitle him to a mortgage at all.
That contract was signed by Henry Walter and by the
first clause therein it is declared that he did "undertake by
these presents to subscribe, convey and sign in favor of
Mr. Edward Kressman of 17 Rue Vanban, Bordeaux,
France, a mortgage for any amount which will be paid by
him for completion of the purchase price as will be stated
hereafter, up to 850,000 francs, this sum of 850,000 francs
being the maximum of what is due for balance as comple-
tion of the purchase price expenses, etc., due or to become
due on the lands purchased by the said Henry Walter by
contract of the 9th of Aprl, 1903," etc.

It is argued that this required Kressman to pay the en-
tire amount of 850,000 francs to entitle him to a mortgage.
The trial court held, and we think correctly, that the con-
tract is not entitled to that construction. In addition to the
above quoted language of the contract, which we think
does not imply or require that Kressman should pay the

entire balance necessary to complete the purchase price, the evidence very clearly shows that he was not expected to do that, but that he was only one of several from whom it was expected to raise the money. All but $10,000 of the money furnished by him was paid to Walter through his solicitors in London. $10,000, the last of the money furnished by him, was received by Rudi Landauer, and it is contended that this money was furnished for other purposes or under such circumstances as not to come under the mortgage contract. But, in our opinion, there is sufficent evidence to sustain the finding of the trial court adverse to that contention, especially in view of several letters written by Walter in 1908 and 1909 acknowledging the obligation of the mortgage, and promising to pay the same, and even referring to it as the first mortgage upon the property.

The contested points as to the d'Hespel mortgage were well considered by the trial court and as briefly as can be done in this opinion without reference to the evidence in detail. We quote the following from the opinion of that court, first explaining that the Syndicate was interested in other Wyoming oil properties:

"This mortgage is resisted only in the amount claimed. It is admitted to the amount of 100,000 francs. It is claimed that the several amounts advanced by d'Hespel were either advanced upon Salt Creek lands as security or were personal advances without security to Rudi Landauer; but we think the fact established by the record is that all the amounts claimed were advanced in cash, without bonus, and that upon the failure to give any security as agreed upon, that the arrangement was for the mortgage upon the Henderson lands. And it is necessary to include the d'Hespel advances to make up the full sum paid for the Henderson lands, including penalties or consideration for extension of time on payments, which full sum Mr. Walter himself fixed as high as 68,000 pounds. There is no reason to believe, and it is improbable, that large sums would have been advanced by Count d'Hespel to Rudi Landauer per-

sonally without security. The receipts and agreements in writing on the d'Hespel advances recite 'Rudi Landauer representing "the Wyoming Syndicate." ' Furthermore, there are letters written by Mr. Walter and by his solicitors which recognize and acquiesce in and promise payment of the d'Hespel mortgage as well as the Kressman mortgage, and that before and after the judgment decreeing mortgages to Kressman and d'Hespel, and fixing the amounts of said mortgages."

The d'Hespel mortgage covered other lands in addition to those here involved, located, as we understand, in the so-called Salt Creek field, and there appears to have been a judicial sale of those lands under the mortgage resulting in a credit thereon of about $30,000. It is clear from the evidence that the original amount of the principal sum secured by that mortgage, $67,500, the equivalent of 337,500 francs, was advanced with the understanding that it was for the Wyoming Syndicate; and that amount of advances by d'Hespel was admitted by the stipulation of May 25, 1906, in his action to establish the mortgage, and also that he was entitled to a mortgage therefor on the Henderson lands.

That 26,240 pounds was actually furnished as the consideration for the Desgenetais mortgage for 30,240 pounds is conclusively established by the evidence, the sum of 4,000 pounds being added to the principal as interest for one year to maturity or as a bonus. As stated by the trial court, the sum thus advanced made up the balance then remaining to complete the payment of the purchase price of the lands, for which a first mortgage was promised Desgenetais through Henry Walter's solicitors, and by his direction the mortgage was executed and recorded. The propriety and consideration of the assignment to Madame Bertrand cannot reasonably be questioned. That the money advanced in the name of Desgenetais was provided by her is clearly shown by the evidence.

It is contended that the mortgage was never delivered. But the fact of executing and recording it after promising that such a mortgage would be executed and recorded must

be held sufficient to constitute a delivery, the act of record-
ing indicating, under the circumstances, that it was intended
as a delivery. Hence the fact that the mortgage afterwards
came into the possession of Mr. Henry Walter's solicitors
in London, who, at his direction, retained it in their cus-
tody, cannot be accepted as showing non-delivery. Henry
Walter's solicitors, on April 26, 1905, wrote to the solicitors
in France representing Desgenetais stating that the amount
necessary to complete the payment of the purchase price
was 25,640 pounds, exclusive of their professional charges
estimated at 600 pounds, that a deed had been executed by
Mr. Walter to Mr. Lobell, the latter being an American
citizen, and: "We undertake on behalf of Mr. Lobell and
Mr. Walter forthwith upon payment of the above sum to
instruct our agents to complete and record in favor of your
client a first mortgage upon the property to secure the re-
payment of that sum without interest at the expiration of
one year from the date of the advance." And on receiving
the money, 26,240 pounds, in London on April 29, 1905,
they gave a receipt therefor, referring therein to their said
letter of the 26th, and stating that the mortgage is to be for
30,240 pounds. And there are other letters from them con-
firming the recording of the mortgage..

It is further contended that the mortgage was paid by
the acceptance of bonds of the Petroleum Maatschappij
Henderson. But we do not understand the evidence to
show a completion of the negotiations for such a settle-
ment, or that any such bonds were received by the mort-
gagee or any one representing him or his interest. There are
some letters in evidence written by one Foulon de Vaulx
to Madame Rudi Landauer, one dated September 24, and
the other September 27, 1908, which seem to have been
written for the purpose of ascertaining what had become
of certain so-called provisional certificates for bonds of the
said company—the writer of the letters being or having
been the president of that company, stating that the writer
had handed to Mr. Sallieres and his group 998 of the cer-
tificates which were deposited in an Austrian bank, and

that he held a proper receipt therefor signed by the said Sallieres. And it appearing that Mr. Sallieres having been approached by Mr. Lobell with a request to raise the money necessary to complete the purchase price of the lands had negotiated the loan from Mr. Desgenetais, and also the securing of the money from Madame Bertrand to aid Desgenetais in making the loan, the letters aforesaid are relied upon as evidence to show that these bond certificates were received in payment of the Desgenetais mortgage. And Mr. Walter testified that said mortgage was paid, but that he did not know how it was paid. The above mentioned letters are certainly not conclusive as evidence of the fact that the certificates mentioned were delivered to Mr. Sallieres, and most clearly do not show that the certificates ever reached Desgenetais or Madam Bertrand, even if entitled to be considered as evidence at all. But Mr. Sallieres testified, when asked if anything had been paid to his knowledge upon the Desgenetais mortgage, that 175,000 francs had been paid as interest. And, upon being asked if he was entitled to receive payment of the interest or the entire principal if it was tendered, he answered: "We did not speak of this. If the entire principal had been offered I should have asked him (Desgenetais) for instructions."

And it seems, as stated by the trial court, that these bond certificates were issued many months prior to the issuance of the company's bonds and before it owned any property; that the only property it owned at any time was the 560 acres here involved; that there is no evidence that the certificates were realized upon or ever presented or exchanged for bonds of the company; and that such bonds were never out of the possession of Mr. Van Houten, who held the same as trustee for the company. We think it also true that the written conditions upon which a settlement by such bonds were proposed were never carried out, at least so far as the Desgenetais mortgage is concerned; and it appears that both Kressman and d'Hespel declined to accept bonds in payment of their respective mortgages. Notwithstanding Mr. Walter's testimony as to the payment of this mortgage,

it appears that in letters written after the alleged settlement, he wrote to the effect that he was raising money to pay it and stating in one of them that it would in due course be settled.

The evidence that the Hillman mortgage was paid in bonds of the said company is very much stronger than that concerning such a settlement of the Desgenetais mortgage, for it shows that Hillman actually received the bonds after telegraphing Mr. Van Houten on May 11, 1908: "I hereby release mortgage twenty thousand pounds and three thousand interest against thirty-four thousand five hundred bonds you holding same for me"; that having been sent under telegraphic instructions from Henry Walter and his solicitor with him at the time in Holland. But as he afterwards returned the bonds to Mr. Walter, who was managing director of the said company, for failure of some of the conditions, the trial court held that his acceptance was not final and should not be considered as a payment of his mortgage.

The remaining questions relate to the Hillman mortgage, it being contended by the plaintiff in error, Charles Walter, that the court erred in finding and declaring by the judgment that the principal sum secured by and due upon that mortgage was $25,000, and that it was not entitled to rank as a first and prior lien upon the property. This is the only mortgage conceded by Henry Walter in his testimony to be a valid lien upon the property, notwithstanding that the contract for the Kressman mortgage was signed by him, and that $47,500 of the amount to be thereby secured was received from Kressman by his solicitors, and paid over to him by them, and that his solicitors, assuming to act for him and Mr. Lobell, and with undoubted authority, agreed in writing for the Desgenetais mortgage to secure the payment of the money which was obtained through Desgenetais, paid into the hands of said solicitors, and used in completing the purchase of the lands; and notwithstanding also that he had frequently, by letters and otherwise, acknowl-

edged the existence and obligation of the Kressman, d'Hespel and Desgenetais mortgages.

"And it is upon Henry Walter's testimony alone that any sum of money is shown to have been loaned or furnished as a consideration for the Hillman mortgage. So far as the evidence discloses, there are no receipts, vouchers, or written memoranda of any kind to corroborate his testimony as to any of the money claimed to have been received by him from Hillman. This mortgage, as above stated, was executed for the sum of $145,000, but Mr. Walter testified that the amount for which it should have been executed, as directed by him, was $100,000, the equivalent of 20,000 pounds, English money, and that the sum of $45,000 was added by Lobell without authority, and he suggests that Lobell added that amount fraudulently, intending eventually to collect that amount for his own use. And by Mr. Hillman's telegram aforesaid of May 11, 1908, to the effect that he released his mortgage against certain of the Dutch company's bonds, it was referred to as a mortgage for 20,000 pounds and 3,000 interest. He also wrote a letter to Van Houten dated Septembr 1, 1908, stating that he would require bonds for 35,400 pounds to discharge the mortgage and interest amounting to 23,600 pounds, and stating further: "With regard to the mortgage of 145,000 dollars kindly bear in mind that I am making no claim in respect to the 45,000 dollars put on to my mortgage without my knowledge or consent." But in a letter dated July 10, 1905, written by Henry Walter's London solicitors to Coudert Bros., Mr. Kressman's solicitors in Paris, on the subject of Mr. Walter's Wyoming oil lands, and referring to the Desgenetais mortgage and what they had written concerning it in a previous letter, they stated: "We are aware that a second mortgage for 29,000 pounds which will in no way interfere with Mr. Niox mortgage is to be created at a short interval after Mr. Niox's mortgage has been recorded." The money provided through Desgenetais was taken to London and paid to the said solicitors there by a Mr. Niox, representing Mr. Sallieres, who was acting for Mr. Desgen-

etais, and the receipt stated that it was received from Mr. Niox, though it was understood that the payment was for and the mortgage was to be made to Mr. Desgenetais, thus accounting for the reference in said letter to Mr. Niox when mentioning the mortgage instead of Mr. Desgenetais; and the Hillman mortgage must have been the second mortgage referred to, since the face amount thereof is the equivalent in our money of 29,000 pounds, and it was the only mortgage recorded after the Desgenetais mortgage, and was dated July 8, 1905, two days before the date of the above letter.

The Hillman answers in this case, as well as his application to open the original decree, each filed and verified by one who signed as agent, and presumably upon authority and information from him, alleged that the mortgage was for the sum of $145,000 and that said sum was due and owing thereon, with interest. And Mr. Hillman's assignment of the mortgage to the plaintiff in error, Charles Walter, dated April 11, 1913, describes the mortgage as securing the payment of $145,000, without any recital therein that the actual consideration was less than that amount. And Charles Walter, upon being substituted as a defendant in place of Hillman, adopted the Hillman answers.

It further appears that while Henry Walter admitted by his testimony that the mortgage was intended and directed to be executed for only the sum of $100,000, he was unable to state the amounts or dates of any payments to him by Hillman exceeding the sum of 7,200 pounds, though he testified that the total amount of such payments was between 13,000 and 14,000 pounds; thus showing, according to his own admission and the only testimony on the subject, that he had directed the execution of the mortgage for at least more than 6,000 pounds in excess of the actual amount of the debt, which, as provided by the mortgage, was to bear interest from the date thereof at the rate of six per cent per annum. But the only money received by Mr. Walter from Mr. Hillman which the former could remember as to amount and date were four payments of 3,000

pounds, 2,000 pounds, 1,780 pounds, and 420 pounds, respectively. And he testified that all the money received by him from Hillman went through the hands of his said London solicitors. The court found that the account kept by said solicitors, which was introduced in evidence and is in the record here by copy, failed to show any amount except 5,000 pounds that could have been received from Hillman. And we think the court was justified in that conclusion.

It also appears that at the time of the assignment of the mortgage only a nominal sum passed as consideration between Charles Walter, the assignee, and Hillman, and that the only additional consideration was an agreement or understanding that said assignee should pay to certain trustees from whatever might be collected on the mortgage the sum of 5,000 pounds for the benefit of Mr. Hillman's wife and children, he then being ill and in a hospital. The subscribing witness to the assignment, a clergyman and one of said trustees, testified: "The conditions of the trust are that if this Hillman mortgage is established 5,000 pounds goes, as far as 2,000 pounds of it is concerned, directly to his widow, and 3,000 pounds is to be kept in trust for the children. Q. What is to be done with the balance? A. How do you mean? It was 5,000 pounds, 2,000 pounds goes to Mrs. Hillman and 3,000 pounds is to be held in trust. Q. Then you were only to act as trustee to receive 5,000 pounds from Mr. Charles Walter, is that it? A. Yes, that is all I have to do. Q. You do not know what consideration was paid for this assignment to Mr. Hillman by Mr. Charles Walter? A. No, I only know money passed. That was a dollar note—, or I do not know what the value of the note was. There was a note which passed." As suggested by the trial court, the right of the assignee to the accumulated interest on said sum would alone seem to have been a sufficient inducement for taking the assignment with the contingent obligation assumed.

We think it sufficient further to say, without rehearsing more in detail the evidence considered by the trial court respecting the amount of the Hillman advances, resulting in

the ultimate finding that no more than 5,000 pounds, or
$25,000, was furnished by Hillman as a consideration for
his mortgage, that it is clearly sufficient to sustain said find-
ing, and that, in our opinion, there is nothing in the record
upon which it could reasonably be disturbed by this court.

As already stated, the defendants in error insisted in the
trial court and here assert their belief that the claim under
the Hillman mortgage should have been disallowed for in-
sufficient evidence to show any actual consideration there-
for, and also because of the evidence showing the payment
of the full amount claimed by Hillman through his accept-
ance of the bonds aforesaid, his executing and forwarding
a release of the mortgage to Van Houten, sending a cable
about the same time to the county clerk in Fremont County
that his mortgage was released, and a release thereof re-
corded in the office of said county clerk, as ex officio reg-
ister of deeds, executed by one George M. Lobell, as attor-
ney in fact for said Hillman under a power of attorney
dated January 27, 1905, appearing to have been executed
by the said Hillman in the presence of two witnesses and ac-
knowledged before H. Clay Evans, Consul General of the
United States at London, England; the said power of at-
torney and the release dated September 15, 1908, each
having been recorded on September 21, 1908. But, as also
previously stated, said defendants in error are not here
complaining of the finding and judgment of the court re-
specting the Hillman mortgage, but are only contesting the
right of the assignee thereof to a lien upon the property for
any greater amount than that allowed by the trial court, or
prior or superior in rank to the other mortgages. The evi-
dence discloses with reference to the recorded release afore-
said that Mr. Hillman, upon being informed of that release,
repudiated it, asserting that he had not given a power of
attorney to George M. Lobell and that the only such power
executed by him was to Joseph H. Lobell, which he had
revoked in 1907. But there is no evidence of the recording
of such a power of attorney to Joseph H. Lobell. It is prob-
able that he was mistaken in the name inserted in the power

which he executed on January 27, 1905, though the trial court suggested that the name may have been changed after the execution of the instrument.

It appears that the court's finding that the four mortgages in question were entitled to equal standing and rank was upon the general ground that justice and equity could not be otherwise done as between the mortgagees, the chief consideration leading to that conclusion seeming to have been that each mortgagee advanced the money to aid in completing the purchase price of the lands and before the borrowers had or could obtain a title for the security of the advances. After reviewing the facts of the several advances, the expectation of each to be secured by mortgage upon the lands, and the dates of the execution or establishing and recording of the mortgages, the court said:

"Under all these circumstances, they each seem to stand in the same attitude; all seem in the class of either cash advances made prior to title lodging in the mortgagor, or all component parts of the final payment—purchase price. The situation is somewhat analogous to number of debts or advances being grouped in one mortgage. * * * * Upon full consideration, and believing that the law sustains the position under all the circumstances of this complicated case, this court has decided to determine the question of rank of mortgages, not upon the question of the earlier advance, or the prior date of execution, recording or delivery or acceptance, nor upon the strong evidence of the intention, or even upon the very strong evidence of agreement, but upon broad grounds of equity."

The original decree declaring the Kressman mortgage to be the first lien, the d'Hespel mortgage the second, and the Desgenetais mortgage the third, was not objected to by either of the mortgagee defendants in error. And there would have been no reason for disturbing the original decree in that respect except to provide that the Hillman mortgage should have equal rank with the three other mortgages. We need not go into the question further than to

ascertain whether that mortgage is entitled to priority over all or either of the other mortgages.

Aside from the fact that the solicitors representing Lobell and Henry Walter agreed that a first mortgage should be executed and recorded in favor of Mr. Desgenetais, confirming it afterwards by letter to Coudert Bros., above mentioned, and the fact also that Henry Walter, assuming to speak for Mr. Hillman, wrote that he would be willing to take second place even to the Kressman mortgage, and was willing to come in after the Desgenetais and Kressman mortgages, if not also the d'Hespel mortgage, it appears that the Desgenetais mortgage was the first mortgage recorded, and that the Hillman mortgage was not recorded for more than two months later. And there is no evidence to show the delivery of the Hillman mortgage prior to the date of its recording. And Mr. Lobell, who, according to Mr. Hillman's written admissions, then represented him as well as Mr. Walter and the other members of the Syndicate, undoubtedly knew of the agreement as to the Desgenetais mortgage and of the purpose to have it first executed and recorded, whether Mr. Hillman personally knew those facts or not; but as Mr. Hillman and Mr. Henry Walter appear to have been close personal friends, and the latter assumed from time to time to speak for him and seemed to be guarding his interest, it might perhaps be inferred that Mr. Hillman was aware of the agreement as to the Desgenetais and also the Kressman mortgage. But without relying upon any such inference it is clear that with respect to the dates of the delivery of the Desgenetais and Hillman mortgages, as determined by the date of recording each, the Hillman mortgage would be inferior and subject to the other. And if not entitled to equal rank with that mortgage it would clearly not be entitled to priority over it.

The Hillman mortgage was not recorded until October 6, 1905, and there is nothing to show a delivery of the mortgage before that date or from which it may be inferred, although it was dated July 8, 1905. In the meantime, on July 14, 1905, the separate d'Hespel and Kressman actions were

commenced setting forth the respective agreements for a
mortgage upon the lands in controversy and asking a judg-
ment requiring such mortgages to be executed. It appears
that the summons in each case had been lost. But from a
motion in each of the actions to set aside the service of
summons upon Mr. Lobell and the default of the defend-
ants, it appears that a summons was served or returned as
having been served upon Lobell, at Casper, in Natrona
County, in this state, on July 20, 1905. That motion was
made partly upon the alleged ground that the summons
was not served in the manner required by the statute. And
the record shows that the motion in each case was over-
ruled.

The principle is well established that a suit for specific
performance of a contract in relation to real property is
within the rule of *lis pendens,* and we think there can be no
doubt that the principle is applicable to the actions brought
by Kressman and d'Hespel for specific performance of the
alleged contract to execute a mortgage upon the lands in
question. (17 R. C. L. 1025, Sec. 22; Marshall v. Whatley,
136 Ga. 805, 72 S. E. 244, 36 L. R. A. (N. S.) 552.) And
see note to the case cited in 36 L. R. A. (N. S.) 552, citing
cases and stating the rule as follows: "There seems to be
no dissent from the proposition that a suit for the specific
performance of a contract in relation to real property is
within the rule as to *lis pendens,* and that, in accordance with
that rule, one who acquires an interest in the property pend-
ing the suit, from a party thereto, is bound by the result of
the suit." (See also note to Stout v. Philippi Mfg. Co., 56
Am. St. Rep. 853-878.)

The statute of this state does not require for the opera-
tion of the rule of *lis pendens* that any notice of the bring-
ing or pendency of the action shall be filed in the office of
the register of deeds, or elsewhere. It merely provides:
"When the summons has been servd, or publication made,
the action is pending, so as to charge third persons with
notice of its pendency; and while pending, no interest can
be acquired by third persons in the subject matter thereof,

as against the plaintiff's title." (Comp. Stat. 1910, Sec. 4374; Rev. Stat. 1899, Sec. 3528.) It has already been stated that the decree in each action required the execution of the mortgage to the plaintiff by the said Lobell as of July 7, 1905, the date of the deed conveying the title to him, that upon the execution of such mortgage it should be recorded by the county clerk and ex officio register of deeds as of said date, and that upon failure to execute the mortgage as required the decree should have the effect and operation of such mortgage in law and equity.

There is no showing of the manner in which the summons was served upon Lobell in those actions aside from the original papers and journal entries therein produced in evidence in this case. And since it appears from the motion and supporting affidavits to set aside the service of summons, that a summons was served, though alleged by the motion to have been served improperly, and from the record in each action that said motion was overruled, the statute as to *lis pendens* should, we think, be held to apply as from the date of the service as shown by the motion signed and filed by attorneys for the defendants, viz.: July 20, 1905. Thus the Hillman mortgage, which is not shown to have been delivered before October 6, 1905, when it was filed for record, would be inferior to each of the mortgages established in said actions. There is no ground, therefore, for the assignee and owner thereof to complain of the decree declaring it to be of equal rank with the other mortgages.

But if we should be mistaken as to the application of the rule of *lis pendens* in support of the priority of the Kressman and d'Hespel mortgages, or as to the effect of the earlier recording of the Desgenetais mortgage, we would not feel disposed to reverse or disturb the judgment as to the relative rank of the several mortgages so as to give priority to the Hillman mortgage, in view of the several facts above stated tending to throw doubt upon the good faith of that mortgage. But we would deem it necessary and proper to sustain the judgment as against the plaintiff

in error, Charles Walter, on the ground that it awarded all that he was entitled to upon the evidence, if not more.

It appears that prior to the final judgment in this case the Kressman, d'Hespel and Desgenetais mortgages had each been assigned by the owners thereof to the Hudson Development Company, and that said assignee was made a defendant in the action upon suggestion of counsel for Kressman and d'Hespel, but that it did not file any pleading in the cause. And it is contended that because of those assignments Kressman, d'Hespel and Madàme Bertrand were not entitled to any relief. But the statute provides that upon any transfer of interest the action may be continued in the name of the original party, or the court may allow the person to whom the transfer is made to be substituted for him. (Comp. Stat. 1910, Sec. 4330.) There was no order of substitution in this case. The facts as to the respective assignments other than the instruments themselves are not disclosed, and, therefore, we are not informed as to the purpose thereof. But whatever their purpose or effect, the right under the statute to proceed in the action in the name of the original parties seems clear. Finding no error in the record prejudicial to the plaintiffs in error, the judgment will be affirmed.  *Affirmed.*

BEARD, J., concurs.

BLYDENBURGH, J., did not sit, not being a member of the court at the time the case was submitted.